UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN MAFFIA, Derivatively On Behalf of Nominal Defendant HARLEYSVILLE NATIONAL CORPORATION, | Civ. Action No. |
| | PLAINTIFF'S SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATION OF §14(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY |
| Plaintiff, | |
| vs. | |
| PAUL GERAGHTY, LEEANN B. BERGEY, WALTER E. DALLER, JR., HAROLD A. HERR, THOMAS C. LEAMER, STEPHANIE S. MITCHELL, A. ROSS MYERS, BRENT L. PETERS, JAMES A. WIMMER, JOHN J. CUNNINGHAM, III, JAMES E. McERLANE, and DEMETRA M. TAKES, | |
| Defendants, | |
| – and – | |
| HARLEYSVILLE NATIONAL CORPORATION, a Pennsylvania corporation, | |
| Nominal Defendant. | |
| | DEMAND FOR JURY TRIAL |

## INTRODUCTION

1.      This is a stockholder class action brought by a holder of the common stock of Harleysville National Corporation ("HNC" or the "Company") against the members of the Company's Board of Directors (the "Board" or the "Individual Defendants"), arising out of their violations of §14(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder in connection with the dissemination of a proxy statement in connection with the merger ("Merger") of the Company with First Niagara Financial Group, Inc. ("FNFG").

2.      This action is also brought derivatively under state law by plaintiff as a shareholder of nominal party HNC on behalf of the Company.  The derivative action is brought against the Individual Defendants, arising out of their breaches of fiduciary duty in connection with the Merger, as well as the circumstances which lead to the Merger's necessity.

3.      On January 22, 2009, shareholders, via an underwhelming three-quarters vote, approved the Merger.  The vote, while ratifying the Merger, demonstrated a lack of enthusiasm fit for a transaction that was "negotiated" under the supposed specter of the threatened regulatory action and put to a vote pursuant to a proxy statement that the Individual Defendants caused HNC to file with the SEC (the "Proxy") that left undisclosed or misstated crucial information that was relevant to shareholders' consideration of the Merger.  More critically, the Merger was the end-result of a series of blunders and missteps that permitted HNC to become substantially over-exposed to real estate lending, which lead to the regulatory scrutiny.  These missteps continued throughout the early part of 2009 as defendants, acting to protect their reputations and utilizing a defective process, managed to squander any and all hopes that HNC shareholders would realize fair value for their shares through the eventual sale of HNC.  Regardless of how or why the Merger came to its now infamous

- 1 -

shareholder approval, the simple fact remains that, in violation of both state and federal law, the Individual Defendants failed in their obligation to shareholders.

4.      That failure was initially announced on July 27, 2009, when the Company disclosed that it had entered into an Agreement and Plan of Merger (the "Merger Agreement") with FNFG, pursuant to which FNFG would acquire HNC in a stock-for-stock deal.  The Merger was to eventually result in HNC shareholders receiving 0.474 FNFG shares for each share of HNC that they owned.  Based upon the five-day average closing price of $11.60 for FNFG stock as of July 22, 2009 (the method of calculation provided in the Merger Agreement), each share of HNC was initially valued at $5.50, with the initial aggregate value of the deal being $237 million.

5.      On or about December 17, 2009, the HNC Board caused the Proxy to be filed with the SEC and disseminated in connection with a scheduled January 22, 2010 shareholder vote.  The Proxy contained a number of false and misleading statements which were material to shareholders who relied upon the Proxy in approving the Merger at the shareholder meeting on January 22, 2010. Indeed, an underwhelming three-quarters of shareholders voted in favor of the Merger, principally due to the many failures of the Individual Defendants as noted herein.

6.      These failures began with the opening of the purported "sales process" which eventually resulted in the Merger.  From the outset, the Proxy discloses a serious lag time where defendants squandered multiple opportunities to act with any eye towards maximizing shareholder value.  From the initial overemphasis upon private equity bidders, to the failure to engage in meaningful discussions with willing (and potentially higher-bidding) alternative suitors, defendants repeatedly failed to represent shareholders' best interests.  In hindsight, defendants then manufactured the possibility of regulatory action and end-of-the-world "run on the bank" to justify their failure to act in shareholders' best interests.  Never mind that their assertions didn't jibe with the realities of banking and regulatory action in mid-2008.  Indeed, defendants had used the $5.50

- 2 -

480409_1

Merger price, agreed upon at the end of July, to revalue the Company, and take a $214 million impairment charge for the quarter ended July 30, 2009, resulting in the Company's first quarterly net loss, and continue the self-fulfilling prophesy of gloom and doom. Defendants then attempted to further substantiate their concerns with specific reference to HNC's tenuous balance sheet and, more specifically, HNC's level of delinquent loans.

7.      Regardless, in an ironic twist, defendants' "sky is falling" cries turned against them, once those cries went from mild half-truths to outright lies. At a macro-economic level, the banking sector managed to find its way out of the woods, resulting in an increased likelihood that HNC wasn't at the edge of the abyss. More critically, defendants did not anticipate that there would be a substantial improvement in HNC's delinquent loan levels. This improvement was material on its own, but became even more relevant given the defendants posturing in the Proxy about the necessity of the Merger.

8.      Thus, it is astounding (and actionable) that, despite knowing these facts about the material improvement in the delinquent loan levels as of November 30, 2009, defendants elected to disseminate the Proxy on December 17, 2009, without update. Instead the Proxy was disseminated as if it were a snapshot frozen in time on or about July 31, 2009. Because of defendants prior overstatement of the crisis that lead to the Merger, defendants came under an affirmative obligation to incorporate these dramatic changes to both the market and HNC into the Proxy. This they did not do. Ultimately, the failure of the Proxy to indicate the substantial improvement in HNC's delinquent loans and the impact this improvement had upon HNC's standing with regulators precluded shareholders from determining whether HNC could carry on as a going-concern or could reasonably expect another bidder to realize the substantial increase in HNC's value and step in if shareholders rejected FNFG's offer. Both of these outcomes represent a significantly more valuable proposition for HNC's shareholders.

9.      This failure was exacerbated by the fact that JP Morgan Securities ("JP Morgan") based its fairness opinion upon financial data that was also stale. Indeed, the failure to require JP Morgan to update the fairness opinion, which was predicated upon data as of July 26, 2009, was a critical misstep because the fairness opinion represented the sole estimate of intrinsic value for shareholders' assessment of the fairness of the Merger. That estimate of intrinsic value also took a substantial reputational hit because it measured the relative value of FNFG (a critical endeavor based on the stock-for-stock nature of the Merger) on limited publicly available information. This failure was further highlighted by the fact that defendants' efforts at reverse due diligence on FNFG occurred over the course of a single day, with JP Morgan relegated to participation solely by conference call.

10.     The Proxy omissions and misrepresentations were not the only violations by defendants of the duties they owe to shareholders in connection with the Merger. The fact that the Merger came to fruition not through the efforts of the Board seeking to maximize shareholder value, but through the wheeling-and-dealing of HNC's self-interested Chief Executive Officer ("CEO") Paul Geraghty ("Geraghty") is also actionable. Geraghty along with the other Individual Defendants demonstrated more concern for their reputations, which were at risk as HNC came under greater regulatory scrutiny, than for maximizing shareholder value.

11.     In light of the undervaluation of HNC and defective sales process, it is unsurprising that FNFG demanded that the Merger Agreement contain provisions designed to ensure the that another bidder could not threaten its offer. In particular, the Merger Agreement contained unlawful provisions that included a $10 million termination fee, as well as a "No Solicitation" provision whereby the Individual Defendants were contractually precluded from fulfilling their fiduciary obligation to act in the best interest of shareholders by soliciting other buyers who might have been willing to offer more than FNFG. Even if an alternate unsolicited purchaser was to offer enough to

- 4 -

justify the payment of the termination fee, the Individual Defendants agreed to provide FNFG notice of any such alternative proposal within 24 hours and also granted FNFG three business days to match any other offer once the Company determined that it was superior, further chilling the market and reducing the likelihood of a forthcoming offer from other potential suitors. Finally, FNFG virtually eliminated the likelihood of any other bidder being able to overtake its offer by providing the Company a $35 million credit line secured by a pledge of over two million shares of Company stock (the "Pledge Security Agreement").

12.    Ultimately, the Merger was the product of a hopelessly flawed process that resulted in the sale of HNC to FNFG on unfair terms that were the product of the Individual Defendants' attempts to protect their own professional reputations and to subvert the interests of HNC and the stockholders of the Company. In furtherance of this plan, defendants issued the false and misleading Proxy which induced shareholders to approve the Merger, which was clearly not in their best interest.

13.    In pursuing the unlawful plan to sell HNC pursuant to a defective sales process, the Individual Defendants breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing. Likewise, the preparation and dissemination of the false and misleading Proxy, induced shareholder action which resulted in substantial harm to plaintiff and HNC's other shareholders.[1]

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over all claims asserted herein pursuant to §27 of the 1934 Act for violations of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. The

---

[1]    The relevant time period for this action is July 27, 2009 through January 22, 2010 (the "Relevant Period").

Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367, as plaintiff's claims arise in part out of the laws of Pennsylvania.

15.     Venue is proper in this District because HNC has its principle place of business in this District. Plaintiff's claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court. Moreover, each of the Individual Defendants, as Company officers and/or directors, has extensive contacts with this District.

## PARTIES

16.     Plaintiff is and has been, at all relevant times, a shareholder of HNC.

17.     Nominal party HNC is a Pennsylvania corporation based in Harleysville, Pennsylvania. The Company is the parent company of Harleysville National Bank, which has been in business since 1909. HNC is the third-largest bank holding company in southeastern Pennsylvania, with assets in excess of $5.5 billion, serving its clients through 85 branches in 9 counties of Pennsylvania. HNC offers a broad array of financial services and products, including banking, mortgage, credit, insurance, financial planning, investment management, compensation consulting and succession planning, to individuals, businesses, municipalities and community organizations.

18.     Defendant Geraghty is HNC's President and CEO. Geraghty has been an HNC director since 2007. Geraghty was a director throughout the Relevant Period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC. Geraghty signed the Merger Agreement.

- 6 -

19.     Defendant Leeann B. Bergey ("Bergey") has been an HNC director since 1999. Bergey was a director throughout the Relevant Period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

20.     Defendant Walter E. Daller, Jr. ("Daller") is Chairman of the Board of HNC and has been an HNC director since 1977.  Daller was a director throughout the Relevant Period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

21.     Defendant Harold A. Herr ("Herr") has been an HNC director since 1987.  Herr was a director throughout the Relevant Period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

22.     Defendant Thomas C. Leamer ("Leamer") has been an HNC director since 2003. Leamer was a director throughout the Relevant Period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

23.     Defendant Stephanie S. Mitchell ("Mitchell") has been an HNC director since 2002. Mitchell was a director throughout the Relevant Period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

24.     Defendant A. Ross Myers ("Myers") has been an HNC director since 2006.  Myers was a director throughout the Relevant Period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

25.     Defendant Brent L. Peters ("Peters") has been an HNC director since 2007.  Peters was a director throughout the Relevant Period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

26.    Defendant James A. Wimmer ("Wimmer") has been an HNC director since 2000. Wimmer was a director throughout the Relevant Period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

27.    Defendant John J. Cunningham, III ("Cunningham") has been an HNC director since 2008. Cunningham was a director throughout the Relevant Period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

28.    Defendant James E. McErlane ("McErlane") has been an HNC director since 2008. McErlane was a director throughout the Relevant Period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

29.    Defendant Demetra M. Takes ("Takes") has been an HNC director since 2005. Takes was a director throughout the Relevant Period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

30.    The defendants named in ¶¶18-29 are collectively referred to herein as the "Individual Defendants."

## DEFENDANTS' DUTIES

31.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, participate in, authorize or acquiesce in the wrongful acts complained of herein.

32.    To discharge their duties, the officers and directors of the Company were further required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

- 8 -

480409_1

(a)    ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of their business including, but not limited to, protecting HNC against the risk over exposure to real estate loans;

(b)    ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including complying with rules and regulations issued by the SEC, state regulatory agencies and state and federal courts before which the Company appears as a party;

(c)    exercise good faith in ensuring that the Company had adequate internal controls such that it is capable of complying with federal law to report all material information to shareholders in the Company's filings with the SEC before shareholder approval of corporate action, and that the Company was actually complying with such laws;

(d)    exercise good faith in supervising the preparation and filing of all reports required by law, including reports filed with the SEC, and in examining and evaluating such reports and other information concerning the affairs of the Company; and

(e)    exercise good faith in remaining informed regarding the affairs of the Company, including, but not limited to, the Company's compliance with federal law pertaining to its obligations to shareholders, and, upon receipt of notice or information regarding imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith and take steps to correct such conditions or practices.

33.    Additionally, by reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with the Company, and owe the Company a duty of highest good faith, fair dealing, loyalty, and full, candid and adequate disclosure.

480409_1

34.     The derivative claims are brought under Pennsylvania state law which requires every corporate director to act in good faith, in the best interests of the corporation and the corporation's shareholders, and to act with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person. Where the officers and/or directors undertake a transaction that will result in either (i) a change in corporate control, (ii) a breakup of the corporation's assets, or (iii) sale of the corporation, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium. To diligently comply with their fiduciary duties, the directors and/or officers may not take any action that:

        (a)     adversely affects the value provided to the corporation's shareholders;

        (b)     contractually prohibits them from complying with or carrying out their fiduciary duties;

        (c)     discourages or inhibits alternative offers to purchase the corporation or its assets; or

        (d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders.

35.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of HNC, are obligated to refrain from:

        (a)     participating in any transaction where the directors' or officers' loyalties are divided;

        (b)     participating in any transaction where the directors or officers receive or are entitled to receive a personal benefit not equally shared by the public shareholders of the corporation;

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders; and/or

(d)     unjustly entrenching themselves as managers and/or officers of the Company by failing to give adequate consideration to legitimate bids for the Company.

36.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Merger, knowingly or recklessly violated their fiduciary duties, including their duties of loyalty, good faith and independence owed to the Company. The Individual Defendants failed to adequately monitor the Company's loan portfolios, engaged in self-dealing and abused their control of HNC, and obtained for themselves personal reputational benefits to the detriment of the Company.

## CLASS ACTION ALLEGATIONS

37.     Because the Individual Defendants, knowingly or recklessly breached their duties of loyalty, good faith, fair dealing, independence and candor in connection with the Merger and/or aided and abetted others who did so, the burden of proving the inherent or entire fairness of the Merger (including all aspects of its negotiation, structure, price and terms) is placed upon the Individual Defendants as a matter of law. The Individual Defendants cannot meet that burden.

38.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of HNC common stock during the Relevant Period who were harmed by defendants' actions described below (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any defendant.

39.     This action is properly maintainable as a class action.

480409_1

40.     The Class is so numerous that joinder of all members is impracticable. According to HNC's SEC filings, there were more than 43 million shares of HNC common stock outstanding as of November 6, 2009.

41.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)     whether the Individual Defendants violated §14(a) of the 1934 Act and SEC Rule 14a-9 by filing a materially false and misleading definitive proxy; and

(b)     whether plaintiff and the other members of the Class have been damaged as a result of the conduct detailed herein.

42.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

43.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

44.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

45.     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

46.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

480409_1

## DERIVATIVE AND DEMAND ALLEGATIONS

47.    Plaintiff brings this action derivatively in the right and for the benefit of HNC to redress injuries suffered, and to be suffered, by HNC as a direct result of the breaches of fiduciary duty by the Individual Defendants.

48.    Plaintiff will adequately and fairly represent the interests of HNC and its shareholders in enforcing and prosecuting his rights.

49.    Plaintiff was an owner of the stock of HNC during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.  Plaintiff did not vote to approve the Merger at the January 2, 2010 shareholder meeting.

50.    Demand has been made on the Board in the form of a multitude of complaints that have been filed to restrain the conduct of defendants to effect and close the Merger.  Defendants have wholeheartedly demonstrated their unwillingness to seek relief for HNC by and through their continuing efforts to close the Merger despite the obvious deficiencies that were raised in those complaints and recounted herein.

51.    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein, and continued to take no action to avoid the reputational harm associated with (i) their failure to monitor HNC's overexposure to real estate lending, (ii) their abject failure at avoiding regulatory scrutiny, and (iii) their dismal efforts at receiving fair value for HNC's shareholders once they deemed a sale the appropriate course.

52.    Plaintiff did not originally make a demand on the Board to file suit for the breaches of fiduciary duty alleged herein because such a demand would have been (and remains) a useless act that will lead to HNC suffering irreparable injury, particularly for the following reasons:

- 13 -

(a)    If plaintiff was required to make demand on the Board, HNC will suffer the irreparable injury of having the Merger complained of herein consummated at an unfair amount and through a defective process as noted herein;

(b)    When the Merger is finally closed, HNC (and, indirectly, HNC's shareholders) will be deprived of the ability to prosecute this action and recover anything for the losses and harms complained of herein; and

(c)    shareholders cannot seek appraisal remedies in Pennsylvania, which means that the ultimate close of the Merger represents an irreparable injury from which they cannot recover.

## BACKGROUND TO DEFENDANTS' WRONGDOING

### The Individual Defendants Agree to Sell the Company to FNFG Via an Unfair Process and at an Unfair Price

53.    On July 27, 2009, the Company announced that it had entered into the Merger Agreement with FNFG, pursuant to which FNFG would acquire HNC in a stock-for-stock deal. The Merger would result in HNC shareholders (possibly) receiving 0.474 FNFG shares for each share of HNC that they own. Based upon the five-day average closing price of FNFG as of July 22, 2009, which was $11.60, each share of HNC was originally valued at $5.50, with the aggregate value of the deal being $237 million. The most important part of this amount is that despite being able to participate, to a limited extent, in the banking sector's substantial improvement in the intervening months, this exchange rate effectively capped HNC's value, tethering it to FNFG which did not have anywhere near the built-in upside that HNC possessed.

54.    The Company announced the Merger in a press release which stated the following, in relevant part:

> First Niagara to Acquire Harleysville National Corporation, with
> $5.6 Billion in Assets and 83 Branches in the
> Philadelphia & Lehigh Valley Areas

- 14 -

*– 237 million acquisition to create a strong foothold in Pennsylvania, 3.15% statewide market share and 140 branches concentrated around Philadelphia and Pittsburgh –*

*– Continuation of strategy to selectively expand geographic footprint in contiguous markets with attractive demographics and long-term growth potential –*

. . . The boards of directors of First Niagara Financial Group, Inc. and Harleysville National Corporation announced that First Niagara has agreed to acquire the Philadelphia-area financial services company in an all-stock transaction valued at approximately $237 million or $5.50 per share.

The acquisition of the Harleysville-headquartered bank will provide First Niagara with $5.6 billion in assets including, $3.6 billion in loans and $4.1 billion in deposits in 83 bank branches across nine Eastern Pennsylvania counties. The parent company of Harleysville National Bank also operates East Penn Bank, Millennium Wealth Management and Cornerstone Companies.

"This move is a terrific next step in our strategy to leverage our strong capital position in markets with attractive demographics and long-term growth potential, where we can profitably play offense. The communities served by Harleysville are perfect complements to First Niagara's stable and resilient markets in Upstate New York and Western Pennsylvania," said First Niagara President and Chief Executive Officer John R. Koelmel. "We're also excited to offer Harleysville employees opportunities to further build their careers with our growing company, while giving them the resources they need to continue providing customers the high level of personalized service they've come to expect."

The companies signed a definitive purchase agreement for the transaction, which is expected to close in the first quarter of 2010 and be accretive to First Niagara diluted earnings per share by approximately 14% in 2011.

Under the terms of the agreement, each Harleysville shareholder will receive 0.474 shares of First Niagara common stock for each Harleysville share owned, representing a premium of about 37.5% based on the Pennsylvania bank's closing price on July 24, 2009 of $4.00 per share. The exchange ratio is based on First Niagara's five-day average closing stock price of $11.60 on July 22, 2009. The exchange ratio is subject to adjustment under certain circumstances if loan delinquencies at Harleysville exceed specified amounts.

\*     \*     \*

"We're very pleased to have found an acquirer with experience in dealing with the integration and cultural issues that come with any two companies combining their businesses," said Harleysville President and Chief Executive Officer Paul D. Geraghty, who will continue to lead his in-market team. *"In First Niagara, we have a strong and profitable partner that will allow us to maintain our focus on community banking customers, while offering employees and investors attractive*

*growth prospects*. This is a great transaction for our customers, our employees, and our shareholders."

First Niagara intends to maintain all Harleysville National and East Penn branches, as well as the Pennsylvania company's growing commercial banking and wealth-management business. Harleysville's workforce currently totals over 1,100 employees.

\*       \*       \*

Upon closing of the Harleysville acquisition, on a pro forma basis, First Niagara expects to maintain well-capitalized Tier 1 and Total Risk Based Capital ratios as well as a tangible common equity ratio in excess of 6%. In order to maintain First Niagara's well-capitalized position, the merger agreement provides specific protections in the event of an increase in Harleysville's loan delinquencies prior to closing.

The transaction has received approvals from the parties' boards of directors, but remains subject to regulatory approval and other customary closing conditions, as well as the approval of Harleysville shareholders.

55.     What the press release failed to mention was that it was actually a failure to "maintain [its] focus on community banking customers," which initially lead HNC into FNFG's waiting arms. Indeed, as shareholders would come to eventually discover, HNC's significant (and very un-community bank-like) overexposure to real estate lending was the precipitating event that forced shareholders to consider accepting FNFG's paltry offer for their equity stake in HNC. If shareholder acquiescence to the Merger were predicated solely upon the fact that defendants handcuffed HNC with such unwarranted overexposure, that fact in itself would be actionable. However, defendants exacerbated their breaches throughout the course of negotiating the Merger, capping off their failures with the dissemination of the false and misleading Proxy, upon which the approval of the Merger was predicated.

56.     Many of those breaches are recited in the background to the Merger that is described in the Proxy. The descriptions are further evidence of how defendants drastically failed to fulfill their obligations to act in shareholders' best interest. Foremost, defendants failed to take any affirmative action until April of 2009, despite the fact that the purported concerns for HNC's health

- 16 -

had been brought to their attention in November 2008. Thereafter, despite having brought on JP Morgan to advise them, they sought only dilutive private equity solutions. It was not until July 6, 2009, nearly two weeks after having been contacted by FNFG, that defendants finally discharged JP Morgan to search for other bank suitors, despite the fact that it was plainly evident from the outset that the most likely suitor (and one that could best serve shareholders' interests) was another bank. Up against an artificial and self-imposed deadline defendants failed to adequately market-test FNFG's offer and, in the process, squandered any chance at maximizing shareholder value.

**The Individual Defendants Issue the False and Misleading Proxy**

57.    On December 17, 2009, the Individual Defendants caused the Proxy to be filed with the SEC and disseminated to shareholders in connection with a shareholder vote on the proposed sale of the Company to FNFG, which was held on January 22, 2010.

58.    The Proxy contained a number of false and misleading statements that were material to shareholders who relied upon the Proxy to their detriment in electing to approve the Merger. The most significant oversight was the Individual Defendants' failure to update the Proxy, which was predicated almost entirely upon stale information from the middle of 2009. Indeed, there were substantial micro- and macro-economic changes that were material to both HNC, the market and shareholders, which defendants failed to incorporate into the Proxy, despite a clear duty to do so.

59.    At a macro-level, the Proxy (and more specifically, the discussion of the background against which the Merger was negotiated) was rooted in a different lending environment. The view from the "edge of the abyss," which defendants posited as justification for the required union with FNFG, was no longer the operative reality. Indeed, despite their indifference to changing market conditions, it is evident that the regulatory and market environments were improving. One measure of this improvement is the KBW Bank Index, which rose more than 100% during the pendency of the negotiations with FNFG. Thereafter, the KBW Bank Index rose another 26% between the time

- 17 -

JP Morgan issued its fairness opinion and the Proxy was disseminated. However, shareholders were left to their own devices to divine whether these marked changes were accounted for by either the Board or JP Morgan. At no point was there a reasoned and principled update of the Proxy or the fairness opinion, which incorporated these facts or gave shareholders the opportunity to make an educated choice about HNC's possibilities as a stand-alone bank.

60.    At a micro-level defendants did not disclose that HNC had seen a significant and material improvement in its level of delinquent loans. Indeed, not only did defendants not disclose this reduction in the context of HNC's financial health, they also failed to require that JP Morgan update its fairness opinion to incorporate this change, as well. This failure left shareholders to literally fend for themselves in determining whether to (i) accept FNFG's deeply discounted offer without learning material information about FNFG finances, regulatory environment in which it operated or reason for the delay in its application for change of reporting to the appropriate bank regulatory authority, (ii) decline on the chance that HNC could survive as a stand-alone bank, or (iii) decline on the off-chance that the appreciable reduction in loan delinquencies would spur additional interest from other suitors willing to purchase HNC now that it was substantially more stable as a going-concern. Regardless, the Proxy lacked a significant amount of material information for shareholders which was necessary to make this assessment.

61.    To put the improvement in context, HNC's delinquent loans dropped from $209.1 million on July 31, 2009 to $173.6 million on November 30, 2009, a nearly 20% reduction. Contributing to this substantial reduction, was the pay-off of $18.4 million of two nonperforming loans. To put this amount in further context, had the amount of the delinquent loans increased by $35 million (from an assumed base of $237.5 million), FNFG had a mechanism in place to pay less than its current offer. However, there was no corresponding mechanism whereby shareholders were able to reap the benefits of HNC's improvement in delinquent loans. Indeed, had the corresponding

- 18 -

exchange rate that FNFG paid for HNC been permitted to "float" in either direction, shareholders could have expected an increase of approximately $0.70 per share, or an additional $30 million.

62.     Given the foregoing it is evident that defendants failed to adequately assess and disclose the value of HNC relative to the FNFG offer. However, since this was a stock-for-stock transaction, there is another half to the derivation of fair value; the value of FNFG. In that regard, defendants failed in their obligations to perform reverse due diligence upon FNFG, in terms of both process and disclosure. As noted in the Proxy, defendants conducted a single day of due diligence without the benefit of their financial advisor (other than via teleconference, an ineffective means to assess value, to say the least). Simply put, it is facially unreasonable to determine the intrinsic value of a nearly $10 billion bank, which serves 418,000 customers through 113 branches in that amount of time. In fact, JP Morgan's review, "with HNC's consent," was limited to publicly-available information and a discussion with the management of FNFG. By way of comparison, FNFG conducted a week of due diligence after having considered the Merger for the better part of at least three weeks. Indeed, the Proxy also discloses that the purpose of the reverse due diligence was not to assess FNFG's relative value, but rather for "[HNC's] management team [to] satisf[y] itself that First Niagara could effectively integrate multiple acquisitions and that the combined capital base of First Niagara and Harleysville National Corporation would benefit Harleysville National Corporation's shareholders, depositor and customer base, and other constituencies." Thus, it is unsurprising that JP Morgan didn't make the trip since defendants were admittedly more concerned with integration issues than valuation.

63.     Consequently, shareholders' interests were forsaken by the inadequate valuation as to both companies, and they were expected, as was the case with HNC's value, to assess for themselves the relative value of FNFG. This was an impossible task without access to FNFG's internal financial data, which defendants had access to, despite their limited effort over the course of a single day

- 19 -

without a financial expert. However, this relative valuation error also impacted the limited upside shareholders received as FNFG's value increased. Foremost, pegging the exchange ratio too low from the outset meant that no matter how much FNFG increased in value, shareholders were never going to receive their fair share for their HNC stock. More importantly, relative to FNFG, HNC's share price had more upside, especially in light of the recent drop in HNC's share price. Coupled with the improvement in the KBW Bank Index and the market as a whole, if HNC's shares could have freely incorporated the reduction in loan delinquencies, HNC's shareholders would have been able to capitalize on even more upside.

64.    Besides the obvious process issues related to conducting a single day of due diligence on FNFG without the presence of JP Morgan, there was also a concern related to defendants' failure to update the limited reverse due diligence once FNFG made the decision to convert to a commercial bank from a thrift. That decision was made well after the Merger was announced (the filing not being made until November 27, 2009) but before the Proxy was disseminated and impacted FNFG in a number of ways, not the least of which is coming under the regularity purview of the Federal Reserve and the OCC. These are fundamental changes and should and would have profoundly impacted any assessment of FNFG's relative value, assuming such an analysis had been done.

65.    As discussed in detail above, the Individual Defendants caused the Proxy to be disseminated without incorporating any of this material macro- or micro-economic information. More importantly, they failed to require that JP Morgan update its fairness opinion, instead permitting the fairness opinion to remain predicated upon financial and valuation data that they knew excluded both the market and HNC's dramatic improvement. The intervening five months rendered the fairness opinion stale and unreliable as a guide for whether the Merger adequately compensated shareholders for their interest in HNC. While the overarching lack of discussion of the financial details effectively rendered the Proxy useless for any shareholder assessing whether FNFG's offer

- 20 -

constituted fair value, there were a significant number of other material omissions which also affected the vote:

(a)    Clearly, the previous discussion calls into questions the conclusion by the Board and JP Morgan that the merger consideration was fair from a financial point of view and was material to shareholders' determination that the consideration was fair and adequate;

(b)    The Proxy also failed to disclose HNC's management projections for calendar years 2009 to 2014, which were used by JP Morgan as the basis for its Stand-Alone Dividend Discount Analysis of HNC in support of the fairness opinion. This omission is brought to the forefront by the fact that the Stand-Alone Dividend Analysis was the only intrinsic financial measure offered to shareholders in the Proxy and such omission directly undermines shareholders' ability to determine the reasonableness of both management's projections and JP Morgan's projections derived therefrom;

(c)    In addition to the abject failure to perform any sort of reverse due diligence on FNFG, the Proxy also failed to disclose the sources for the financial projections for FNFG for calendar years 2009 to 2014 and the assumptions underlying those projections. Indeed, given the initial reverse due diligence contested the source of these projections would have been of import to shareholders prior to the vote. JP Morgan used the projections as the basis for its Stand Alone Dividend Discount Analysis of FNFG in support of the fairness opinion, which, as was the case for HNC, was the sole measure of intrinsic value available to shareholder in assessing the relative value of FNFG, which directly undermined shareholders' ability to determine the reasonableness of JP Morgan's selection and use of those sources and the projections derived therefrom;

(d)    The Proxy failed to disclose the criteria for selection of the comparable companies used by JP Morgan in its Selected Companies Analysis for HNC, as well as the criteria utilized to designate a comparable company as "primary," which directly undermined shareholders'

ability to determine the reasonableness of JP Morgan's selection and use of those comparable companies;

(e)     The Proxy failed to disclose the criteria for selection of the comparable companies used by JP Morgan in its Selected Companies Analysis for FNFG , as well the rationale for not designating any of the selected companies as "primary," which directly undermined shareholders' ability to determine the reasonableness of JP Morgan's selection and use of those comparable companies; and

(f)     The criteria for selection of the comparable transactions used by JP Morgan in its Selected Transactions Analysis either (i) implied that there were only four comparable transactions from October 1, 2008 through the date of the opinion, or (ii) that JP Morgan selected the four indicated transactions based upon unknown and undisclosed criteria, either of which undermines shareholders' ability to determine the reasonableness of JP Morgan's selection and/or use of those comparable transactions as a basis for comparison to the Merger.

66.     In addition to the aforementioned valuation omissions, the Proxy is also false and misleading because it omits and/or misrepresents the following material information about the process leading up to, and including, the Merger:

(a)     the role JP Morgan played after it was retained in the first quarter of 2009, especially as regarded HNC's discussions and presentations to the Office of the Comptroller of the Currency (the "OCC"), which directly bore upon JP Morgan's potential conflicts of interest once it was charged with finding a buyer or equity investor, a fact that was material to shareholders in their consideration of JP Morgan's fairness opinion;

(b)     the rationale for withdrawing the Company's Troubled Asset Relief Program ("TARP") application after discussions with the OCC, the substance of those discussions and whether those discussions involved the Treasury, all of which directly bore upon shareholders'

consideration of whether to approve the Merger or reject it because of the possibility that TARP relief was still a viable option for HNC;

(c)      the rationale for engaging JP Morgan in the first quarter of 2009, only to wait until June 8, 2009 (over a week after the OCC had formally notified HNC that it would be subject to individual minimum capital ratios ("IMCRs") as of July 31, 2009) to publicly announce the strategic initiatives designed to meet the IMCRs, which delay was material to shareholders' consideration of whether the Merger resulted from a fair process designed to ensure the maximization of shareholder value;

(d)      the rationale for initially focusing upon dilutive private equity transactions to the exclusion of any other strategic initiatives, which was material to shareholders' consideration of whether the Merger resulted from a fair process designed to ensure the maximization of shareholder value;

(e)      the criteria used by JP Morgan to select the 16 private equity investors initially contacted, which was material to shareholders' consideration of whether the Merger resulted from a fair process designed to ensure the maximization of shareholder value;

(f)      the amount of the termination fee required by Investor X, which was material to shareholders' consideration of whether the decision of the Individual Defendants to not engage in negotiations with Investor X was reasonable under the circumstances and how that determination impacted the fairness of the process that resulted in the Merger;

(g)      the criteria used by JP Morgan to select the nine financial institutions considered for a merger transaction, which was material to shareholders' consideration of whether the Merger resulted from a fair process designed to ensure the maximization of shareholder value;

(h)      the actual price range of the offer in the "third proposal" made by the unnamed financial institution, especially in light of the unintelligible description that the offer range

established an amount "only 25% of which was above the price offered by [FNFG]," how the range, assuming it was 25% above FNFG's offer price, could have reasonably been described as "only 25%" above, and the basis for JP Morgan's and/or management's "past experience" with this institution which led to the decision to not engage in negotiations with the institution, which was material to shareholders' consideration of whether the decision by the Individual Defendants to not engage in negotiations with the unnamed financial institution was reasonable under the circumstances and how that determination impacted the fairness of the process that resulted in the Merger; and

(i)    JP Morgan's prior and ongoing transactional relationship with FNFG, especially as it related to the fees earned for "providing securities, trading and foreign exchange services" to FNFG and any attendant counter-party risk JP Morgan bore for any services it provided to either FNFG or HNC, must be disclosed because such fees and counter-party risks directly underscore potential conflicts of interest that JP Morgan might have had when rendering its fairness opinion, which would have materially impacted shareholders' consideration of the veracity of the fairness opinion.

67.    For the above-stated reasons, the information detailed in ¶¶65-66 was also information that a reasonable shareholder would have considered material when deciding whether to approve the Merger because the information bore directly upon (i) the actual value of the Company and its assets; (ii) the assumed value of FNFG and its assets; and (iii) whether the process that resulted in the Merger was fair and designed to maximize shareholder value.

68.    The Individual Defendants were aware of their duty to disclose this material information in the Proxy, and acted with at least negligence in failing to ensure that this material information was disclosed in the Proxy.  The Individual Defendants were further aware of and failed to fulfill their obligation to have JP Morgan update its fairness opinion to incorporate the significant

- 24 -

reduction in HNC's delinquent loans and the overarching change in the banking market as a whole, among other things. The Class was not able to cast an informed vote in consideration of the sale of the Company to FNFG because they lacked the aforementioned material information when they voted at the shareholder meeting on January 22, 2010.

**The Individual Defendants Impermissibly Locked Up the Merger with Preclusive Deal Protection Devices**

69.    Beyond the misstatements and omissions about the sales process and valuation noted above, the sales process was also handicapped by a number of other significant issues, not the least of which is that the Merger was agreed to not through the efforts of the Board seeking to maximize shareholder value, but through the wheeling and dealing of Geraghty. Geraghty along with the other Individual Defendants demonstrated more concern for their reputations, which were at risk as HNC came under greater regulatory scrutiny, than for maximizing shareholder value by agreeing to the Merger.

70.    By Geraghty's own admission, the Merger was the result of a "lunch-and-drive" meeting with FNFG's CEO Koelmel, who was armed with an "analysis from an investment bank that [Geraghty] thought was on target so [Geraghty] felt [FNFG/Koelmel] would deliver on the price." In a recent *Business Journal* article, Geraghty's self-interest was readily apparent:

> "The CEO of Harleysville National Corp., which agreed Monday to be sold to First Niagara Financial Group, spent the past few months trying to raise money in order to ease regulators' concerns about the bank's capital ratios.

> Ultimately, the bank failed to meet a June 30 deadline imposed by federal bank regulators to improve the ratios. But while Paul Geraghty was exploring opportunities with private equity firms, he received a call from John R. Koelmel, CEO of Buffalo, N.Y.-based First Niagara.

> "He said, 'I know you are exploring private equity but that could be dilutive. Why not consider a strategic deal?,'" Geraghty recalled in an interview the afternoon the $237 million deal was announced.

> Geraghty met Koelmel at Northeast Philadelphia Airport last month and the two CEOs spent several hours driving around to visit Harleysville National's

suburban branches before grabbing lunch in Flourtown, Pa., not far from the bank's headquarters in Harleysville. The initial meeting snowballed into Monday's announcement.

"We had a great dialogue," Geraghty said. "I came to believe that being part of a $20 billion-asset bank was best for our shareholders, employees and customers. [Koelmel] had analysis from an investment bank that I thought was on target so I felt they would deliver on the price."

That meeting occurred on a Wednesday and Geraghty said he recommended to the board the next Monday that it pursue the First Niagara deal. He said he cited three reasons: Having a broader array of products to offer customers; the ability to leverage technology because of scale; and First Niagara's favorable capital position.

\*     \*     \*

Geraghty said he will stay on with First Niagara through the systems conversion and integration. He said he did not want to recommend the deal to the Harleysville board while he had a job secured with the new owners. But he thinks there is a good possibility that something permanent could be in the works.

"I would like to work for 10 or 12 more years and I would just as soon have it be here," Geraghty said."

71.     As noted in the story in the *Business Journal*, the Company was under scrutiny from federal regulators concerned about HNC's capital cushion. This, however, was the norm and no longer the exception, especially in the regional banking industry. Federal regulators are, and were at the time, wont to act on these capital concerns, a notion buttressed by the fact that HNC operated with impunity for nearly four weeks after the June 30 "deadline." Indeed, HNC was given a further reprieve from the OCC to comply with the IMCRs until March 31, 2010. However, what was at play was FNFG's CEO looking to take advantage of a recent downturn in the value of HNC to steal a valuable asset for FNFG. Koelmel's production of a surreptitious investment banker's report aside, Geraghty along with the other Individual Defendants were willing participants in the charade that led to the signing of the Merger Agreement, as each of them acted out of concern for their own reputational and professional interests instead of maximizing shareholder value.

480409_1

72.     Because of how the Merger came together and in light of the previously noted undervaluation of HNC and failure to perform any valuation of FNFG, it is not surprising that FNFG demanded that the Merger Agreement contain provisions designed to ensure that another bidder could not threaten its offer. To that end, the terms of the Merger Agreement were designed to ensure the sale of HNC to FNFG through the inclusion of a series of onerous terms that effectively locked out any other prospective bidders for the Company and removed any opportunity for there to be a market check on the consideration FNFG offered.

73.     Specifically, §6.10(a) of the Merger Agreement included a "no solicitation" provision barring the Board and any Company personnel from attempting to procure a price in excess of the amount offered by FNFG. Indeed, this section even required that the Company "cease and cause to be terminated any and all existing discussions, negotiations, and communications" with alternate suitors. Despite the fact that they had locked up the Company and bound it to not solicit alternative bids, the Merger Agreement provided other ways that guaranteed that the only suitor would be FNFG.

74.     Pursuant to §6.10(c) of the Merger Agreement, if an unsolicited bidder arrived on the scene, the Company was required to notify FNFG of the bidder's offer within 24 hours of receipt by the Company. Not only did FNFG get notice that there was another potential bidder, the Company was contractually bound to provide FNFG with a copy of the unsolicited offer. Thereafter, if the Board determined that the unsolicited offer was superior, FNFG was granted three days to amend the terms of the Merger Agreement to make a counteroffer that only needed to be at least as favorable to the Company's shareholder as the unsolicited offer.

75.     In other words, the Merger Agreement gave FNFG access to any rival bidder's information and allowed FNFG a free right to top any superior offer. Accordingly, no rival bidder was likely to emerge and act as a stalking horse for FNFG, because the Merger Agreement unfairly

- 27 -

assured that any "auction" would run to the favor of FNFG and piggy-back upon the due diligence of the foreclosed second bidder.

76.     In addition, if any other bidder were to have come unsolicited and overcome the right of first refusal, the Merger Agreement provided that a termination fee of $10 million was to be paid to FNFG by HNC if the Company decided to pursue said other offer, thereby requiring that the alternate bidder essentially agree to pay a naked 4.2% premium for the right to provide the shareholders with a superior offer.

77.     Finally, FNFG virtually eliminated the likelihood of any other bidder being able to overtake its offer by providing the Company a $35 million credit line secured by a pledge of over 2 million shares of the Company stock through the Pledge Security Agreement.  In concert with the Pledge Security Agreement, FNFG also entered into an agreement whereby it was able to cherry-pick $80 million of HNC's loans in order to reduce HNC's outstanding indebtedness, a transaction that necessarily made HNC less valuable to any other acquirer.

78.     Ultimately, the "no solicitation" clause and the unlimited right of first refusal, coupled with the termination fee and the Pledge Security Agreement, illegally restrained the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which HNC's Board could have responded to an unsolicited written bona fide proposal for an alternative acquisition that constituted or would have reasonably been expected to constitute a superior proposal are too narrowly circumscribed to have provided an effective "fiduciary out" under the circumstances. Given the foregoing, the fact that an alternate suitor did not arrive, despite the substantial improvement in HNC's delinquent loan status, was a foregone conclusion.

480409_1

## COUNT I

### Against the Individual Defendants for Violations of
### §14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder

79.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

80.     During the Relevant Period, the Individual Defendants disseminated the false and misleading Proxy specified above which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

81.     The Proxy was prepared, reviewed and/or disseminated by the Individual Defendants. It misrepresented and/or omitted material facts, including material information about the true value of both FNFG and the Company, as well as the unfairness of the sales process.

82.     In so doing, the Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy.

83.     The Individual Defendants also failed to correct the Proxy as it became evident that HNC was recovering substantial amounts on its bad loans, rendering the assumed loan loss amounts inapposite and calling into question all of the projections predicated upon the prior loan loss amounts being that they were projected at the time the Merger Agreement was signed.  This failure to update and correct these knowingly false statements was also a violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy.

- 29 -

84.     Because the false and misleading statements in the Proxy were not corrected, the Class, which was unaware of untruths and misinformation, relied to its detriment on the Proxy and was induced to cast an uninformed vote in favor of the Merger at the January 22, 2010 shareholder meeting.  By reason of such misconduct, the Individual Defendants are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II

### For Breach of Fiduciary Against the Individual Defendants

85.     Plaintiff repeats and realleges each allegation as though fully set forth herein.

86.     This claim is brought on behalf of HNC, which was harmed by the Individual Defendants' abdication of their fiduciary duties in connection with the sale of HNC, as detailed herein.

87.     The Individual Defendants violated fiduciary duties of care, loyalty, good faith, fair dealing, candor and independence owed to HNC, acted to put their personal interests and/or the interests of FNFG ahead of the interests of HNC, and/or aided and abetted others in doing so.

88.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as part of a common plan, unfairly deprived plaintiff and shareholders of the true value of their investment in HNC.

89.     The Individual Defendants violated their fiduciary duties by entering into the Merger with FNFG without regard to the fairness of the Merger to HNC or its shareholders.

90.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, fair dealing, candor and independence owed to HNC, because, among other reasons:

480409_1

(a)    they failed to take steps to maximize the value of HNC to its public shareholders and they took steps to avoid competitive bidding, to cap the price of HNC's stock and failed to solicit other potential acquirors or alternative transactions;

(b)    they failed to adequately undertake reverse due diligence on FNFG, making it impossible for them to assess whether the exchange ratio offered by FNFG was either fair or adequate;

(c)    they ignored or did not protect against the numerous conflicts of interest resulting from the Individual Defendants' own inter-relationships and/or self-dealing in connection with the Merger; and

(d)    they failed to disclose material information and/or made material misrepresentations to shareholders regarding among other things, the true value of the Company and the true reason for entering into the Merger.

91.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have breached their fiduciary obligations owed to HNC.

92.    As a result of the actions of the Individual Defendants, plaintiff and HNC shareholders have been damaged in that they have not received their fair portion of the value of HNC's assets and businesses and have been prevented from obtaining a fair amount for their shares.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Awarding damages as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

B.    Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: February 3, 2010

LAW OFFICES BERNARD M. GROSS, P.C.
DEBORAH R. GROSS

_DEBORAH R. GROSS_

DEBORAH R. GROSS

Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone: 215/561-3600
215/561-3000 (fax)

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
RANDALL J. BARON
A. RICK ATWOOD, JR.
DAVID T. WISSBROECKER
AARON W. BEARD
655 W. Broadway, Suite 1900
San Diego, CA 92101
Telephone:  619/231-1058
619/231-7423 (fax)

KENDALL LAW GROUP, LLP
JOE KENDALL
HAMILTON LINDLEY
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)

BONI & ZACK LLC
MICHAEL J. BONI
15 St. Asaphs Rd.
Bala Cynwyd, PA 19004
Telephone: 610/822-0201
610/822-0206 (fax)

480409_1

DONOVAN SEARLES, LLC
MICHAEL D. DONOVAN
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Telephone: 215/732-6067
215/732-8060 (fax)

Attorneys for Plaintiff

480409_1

## VERIFICATION

I, John Maffia, have read the PLAINTIFF'S AMENDED SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATION OF §14(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY and know the contents thereof. The Complaint is true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the following is true and correct. Signed and Accepted.

Dated: 2 / 3 / 10

_____
John Maffia

## CERTIFICATION OF JOHN MAFFIA

1.    I, JOHN MAFFIA, have reviewed the Complaint and have authorized the filing of same;

2.    I did not purchase the securities of HARLEYSVILLE NATIONAL BANK at the direction of plaintiff's counsel or in order to participate in any private action arising under this title of the federal securities laws;

3.    I am willing to serve as class representative and provide testimony at deposition and trial if necessary;

4.    My transactions in the securities of Harleysville National Bank consisted of the following:

| Date | Purchase(s) or Sales(s) | Amount | Price |
|------|-------------------------|--------|-------|

See attached Exhibit A

5.    During the previous three years, I have or have not been a lead plaintiff in the any securities fraud class action.

6.    I will not accept any payment for serving as a class representative beyond my pro rata share of any recovery, except as ordered or approved by the Court with respect to an award for reasonable costs and expenses (including lost wages).

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 3rd day of February, 2010, at Jamesburg, NJ.



John Maffia

EXHIBIT A

| Date | Purchase(s) or Sales(s) | Amount | Price |
|---|---|---|---|
| 6/9/2008 | Purchase | 31 | $13.25/share |
| 6/9/2008 | Purchase | 89 | $13.25/share |
| 12/17/2007 | Purchase | 90 | $14.48/share |
| 7/18/2007 | Purchase | 65 | $15.3699/share |
| 5/15/2007 | Purchase | 200 | $16.0099/share |
| 5/15/2007 | Purchase | 100 | $16.01/share |
| 4/23/2007 | Purchase | 200 | $17.02/share |
| 4/23/2007 | Purchase | 100 | $17.03/share |
| 4/23/2007 | Purchase | 100 | $17.03/share |
| 4/23/2007 | Purchase | 100 | $17.03/share |
| 4/11/2007 | Purchase | 53 | $17.02/share |
| 4/11/2007 | Purchase | 47 | $17.02/share |
| 4/11/2007 | Purchase | 100 | $17.02/share |
| 4/11/2007 | Purchase | 100 | $17.02/share |
| 4/11/2007 | Purchase | 100 | $17.02/share |
| 4/11/2007 | Purchase | 100 | $17.02/share |
| 4/9/2007 | Purchase | 90 | $17.29/share |
| 4/9/2007 | Purchase | 73 | $17.29/share |
| 4/9/2007 | Purchase | 10 | $17.29/share |
| 4/9/2007 | Purchase | 108 | $17.29/share |
| 4/9/2007 | Purchase | 186 | $17.29/share |
| 4/9/2007 | Purchase | 63 | $17.29/share |
| 4/9/2007 | Purchase | 26 | $17.29/share |
| 4/9/2007 | Purchase | 44 | $17.29/share |
| 4/9/2007 | Purchase | 100 | $17.29/share |
| 4/9/2007 | Purchase | 100 | $17.29/share |
| 4/9/2007 | Purchase | 100 | $17.29/share |
| 4/9/2007 | Purchase | 100 | $17.29/share |
| 4/5/2007 | Purchase | 25 | $17.66/share |
| 3/5/2007 | Purchase | 1000 | $17.62/share |
| 1/5/2007 | Purchase | 38 | $19.12/share |
| 1/5/2007 | Purchase | 20 | $19.12/share |
| 1/5/2007 | Purchase | 300 | $19.12/share |
| 1/5/2007 | Purchase | 100 | $19.12/share |
| 1/5/2007 | Purchase | 100 | $19.12/share |
| 1/5/2007 | Purchase | 100 | $19.12/share |
| 1/5/2007 | Purchase | 100 | $19.12/share |
| 1/5/2007 | Purchase | 100 | $19.12/share |
| 1/5/2007 | Purchase | 100 | $19.12/share |
| 1/5/2007 | Purchase | 42 | $19.12/share |
| 12/15/2006 | Purchase | 1000 | $19.90/share |

Scottrade - Transactions



Log Off

Scottrade   Your last login was: 2/2/2010 4:14:59 PM ET

Detailed Quote: [ ]  Go

53501801   My Account

Help   Tutorial   Print

Hello, JOHN MAFFIA

**Account History**

Balances
Positions
Watch Lists & Portfolios
Gain/Loss & Tax Center
Account History
Order Status
Deposits
Withdrawals
My Information & Preferences
Alerts

Transactions | Confirmations | Account Statements | Tax Statements

Date          Transactions          Symbol                    Download File
All Available  Buys                              Go          Select File Type  Go

Build Option Symbol

Select Date Range

Transaction History does not include today's transactions.   Results No. 1 - 100 of 121 | Page 1 of 2

Add To Watch List
ggwpq.pk

Quick Quote:
Symbol or Name  Go
Find Symbol
Build Option Symbol

DJIA    10,283.75   -33.10
NASDAQ  2,187.38    -2.68
S&P 500  1,095.84   -7.38

Refresh  Detailed
Market Closes: 1hr 18min
2/3/2010 2:42 PM ET

Text Size:

| Date | Symbol | Description | Commission/Fees | Interest | Amount | |
|------|--------|-------------|-----------------|----------|--------|---|
| 4/8/2009 | XTEX | BOUGHT 100 SHARES OF XTEX AT $1.96 | ($7.00) | $0.00 | ($203.00) | |
| 4/8/2009 | XTEX | ~~BOUGHT 100 SHARES~~ | $0.00 | $0.00 | ~~($197.00)~~ | |
| 4/7/2009 | LVLT | ~~BOUGHT 100 SHARES OF LVLT AT $1.49~~ | $0.00 | $0.00 | ($802.00) | |
| 4/7/2009 | XTEX | ~~BOUGHT 100 SHARES OF XTEX AT $2.54~~ | $0.00 | $0.00 | | |
| 11/9/2008 | FONR | ~~BOUGHT 1000 SHARES OF FONR AT $1.60~~ | ($7.00) | $0.00 | ($1,607.00) | |
| 11/5/2008 | FRO | ~~BOUGHT~~ | $0.00 | $0.00 | ($3,057.00) | |
| 11/5/2008 | FRO | BOUGHT 100 SHARES OF FRO AT $36.00 | ($7.00) | $0.00 | ($3,607.00) | |
| 6/9/2008 | HNBC | BOUGHT 31 SHARES OF HNBC AT $13.25 | $0.00 | $0.00 | ($410.75) | |
| 6/9/2008 | HNBC | BOUGHT 89 SHARES OF HNBC AT $13.25 | ($7.00) | $0.00 | ($1,186.25) | |
| 12/17/2007 | HNBC | BOUGHT 90 SHARES OF HNBC AT $14.48 | ($7.00) | $0.00 | ($1,310.20) | |
| 11/__/2007 | XTEX | ~~BOUGHT~~ $3.85 | ($7.00) | $0.00 | ($2,604.00) | |
| 11/8/2007 | HNBC | ~~BOUGHT~~ $1.05 | ($7.00) | $0.00 | ($3,501.05) | |
| 11/__/2007 | ~~HNBC~~ | ~~BOUGHT 145 SHARES OF HNBC AT $1.105~~ | | | ($719.00) | |
| 11/__/2007 | ~~HNBC~~ | ~~BOUGHT~~ | | | ($700.00) | |
| 11/8/2007 | ~~XTEX~~ | ~~BOUGHT~~ $14.45 | | $0.00 | | |
| 11/5/2007 | HNBC | ~~BOUGHT 1000 SHARES OF~~ $10.45 | | | ($164.00) | |
| 8/__/2007 | ENCY | BOUGHT 400 SHARES OF ENCY AT $2.64 | | | ($1,006.04) | |
| 7/18/2007 | HNBC | BOUGHT 65 SHARES OF HNBC AT $15.3699 | ($7.00) | $0.00 | ($1,006.04) | |
| 6/8/2007 | GTCB | ~~BOUGHT~~ $4.48 | $0.00 | $0.00 | | |
| 6/8/2007 | GTCB | ~~BOUGHT~~ | ($7.00) | $0.00 | ($126.__) | |
| 6/7/2007 | GTCB | BOUGHT ~~SHARES~~ $1.18 | | | ($855.00) | |
| 6/5/2007 | VION | ~~BOUGHT 1500 SHARES OF VION AT $1.20~~ | | | | |
| 6/5/2007 | GTCB | ~~BOUGHT 300 SHARES OF GTCB AT $1.18~~ | $0.00 | $0.00 | ($3,201.98) | |
| 5/15/2007 | HNBC | BOUGHT 200 SHARES OF HNBC AT $16.0099 | ($7.00) | $0.00 | ($1,608.00) | |
| 5/15/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $16.01 | ($7.00) | $0.00 | ($1,647.00) | |
| 5/3/2007 | AVNX | BOUGHT 1000 SHARES OF AVNX AT $1.64 | $0.00 | $0.00 | ($3,404.00) | |
| 4/23/2007 | HNBC | BOUGHT 200 SHARES OF HNBC AT $17.02 | $0.00 | $0.00 | ($1,703.00) | |
| 4/23/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $17.03 | ($7.00) | $0.00 | ($1,710.00) | |
| 4/23/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $17.03 | $0.00 | $0.00 | ($1,703.00) | |
| 4/11/2007 | HNBC | BOUGHT 53 SHARES OF HNBC AT $17.02 | $0.00 | $0.00 | ($902.06) | |
| 4/11/2007 | HNBC | BOUGHT 47 SHARES OF HNBC AT $17.02 | $0.00 | $0.00 | ($799.94) | |
| 4/11/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $17.02 | ($7.00) | $0.00 | ($1,709.00) | |
| 4/11/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $17.02 | $0.00 | $0.00 | ($1,702.00) | |

Page 2 of 3

Scottrade - Transactions

| Date | Symbol | Description | | | |
|---|---|---|---|---|---|
| 4/11/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $17.02 | $0.00 | $0.00 | ($1,702.00) |
| 4/11/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $17.02 | $0.00 | $0.00 | ($1,702.00) |
| 4/9/2007 | HNBC | BOUGHT 90 SHARES OF HNBC AT $17.29 | $0.00 | $0.00 | ($1,556.10) |
| 4/9/2007 | HNBC | BOUGHT 73 SHARES OF HNBC AT $17.29 | $0.00 | $0.00 | ($1,262.17) |
| 4/9/2007 | HNBC | BOUGHT 10 SHARES OF HNBC AT $17.29 | $0.00 | $0.00 | ($172.90) |
| 4/9/2007 | HNBC | BOUGHT 108 SHARES OF HNBC AT $17.29 | $0.00 | $0.00 | ($1,867.32) |
| 4/9/2007 | HNBC | BOUGHT 186 SHARES OF HNBC AT $17.29 | $0.00 | $0.00 | ($3,215.94) |
| 4/9/2007 | HNBC | BOUGHT 63 SHARES OF HNBC AT $17.29 | $0.00 | $0.00 | ($1,089.27) |
| 4/9/2007 | HNBC | BOUGHT 26 SHARES OF HNBC AT $17.29 | $0.00 | $0.00 | ($449.54) |
| 4/9/2007 | HNBC | BOUGHT 44 SHARES OF HNBC AT $17.29 | $0.00 | $0.00 | ($760.76) |
| 4/9/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $17.29 | $0.00 | $0.00 | ($1,729.00) |
| 4/9/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $17.29 | $0.00 | $0.00 | ($1,729.00) |
| 4/9/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $17.29 | $0.00 | $0.00 | ($1,729.00) |
| 4/9/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $17.29 | ($7.00) | $0.00 | ($1,736.00) |
| 4/5/2007 | HNBC | BOUGHT 25 SHARES OF HNBC AT $17.66 | ($7.00) | $0.00 | ($448.50) |
| 3/5/2007 | HNBC | BOUGHT 1000 SHARES OF HNBC AT $17.62 | ($7.00) | $0.00 | ($17,627.00) |
| 1/5/2007 | HNBC | BOUGHT 38 SHARES OF HNBC AT $19.12 | $0.00 | $0.00 | ($726.56) |
| 1/5/2007 | HNBC | BOUGHT 20 SHARES OF HNBC AT $19.12 | $0.00 | $0.00 | ($382.40) |
| 1/5/2007 | HNBC | BOUGHT 300 SHARES OF HNBC AT $19.12 | $0.00 | $0.00 | ($5,736.00) |
| 1/5/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $19.12 | $0.00 | $0.00 | ($1,912.00) |
| 1/5/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $19.12 | $0.00 | $0.00 | ($1,912.00) |
| 1/5/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $19.12 | $0.00 | $0.00 | ($1,912.00) |
| 1/5/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $19.12 | $0.00 | $0.00 | ($1,912.00) |
| 1/5/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $19.12 | $0.00 | $0.00 | ($1,912.00) |
| 1/5/2007 | HNBC | BOUGHT 100 SHARES OF HNBC AT $19.12 | $0.00 | $0.00 | ($1,912.00) |
| 1/5/2007 | HNBC | BOUGHT 42 SHARES OF HNBC AT $19.12 | ($7.00) | $0.00 | ($810.04) |
| 12/15/2006 | HNBC | BOUGHT 1000 SHARES OF HNBC AT $19.90 | ($7.00) | $0.00 | ($19,907.00) |